NEALON, J,
ORDER
The hospital defendants, Marian Community Hospital, Maxis Health System and Catholic Health East (“Marian”), in this psychiatric malpractice action have filed a motion for reconsideration of the memorandum and order dated March 27,2015, holding that the Sentinel Event Report, which Marian forwarded to the private accreditation organization, The Joint Commission, was not protected from discovery by Section 4 of the Peer Review Protection Act (“PRPA”), 63 P.S. § 425.4, Section 311(a) of the Medical Care Availability and Reduction of Error (“MCARE”) Act, 40 P.S. § 1303.311(a), or Section 299b-22 of the federal Patient Safety & Quality Improvement Act of2005 (“PSQIA”), 42 U.S.C. § 299b-22. See Brink v. Mallick, 2015 WL 1387936 (Lacka. Co. 2015). Marian does not challenge those aspects of the earlier discovery ruling made under the MCARE Act and the PSQIA, and instead bases its motion for reconsideration solely upon the PRPA. (Docket entry no. 201 at ¶¶ 10-15; Docket entry no. 205 at pp. 4-12). In support of its motion for reconsideration, Marian has submitted its applicable Sentinel Event Policy which it did not produce, as directed, in conjunction with the original discovery proceeding. (Docket entry no. 201, *499 Exhibit A). Following the parties’ submission of their briefs and the completion of oral argument on May 28, 2015, Marian’s motion for reconsideration became ripe for disposition. (Docket entry nos. 203,205,210).
The PRPA “‘serve[s] the legitimate purpose of maintaining high professional standards in the medical practice for the protection of patients and the general public.’” Troescher v. Grody, 869 A.2d 1014, 1020-1021 (Pa. Super. 2005) (quoting Cooper v. Delaware Valley Medical Center, 428 Pa. Super. 1, 14, 630 A.2d 1, 7 (1993), aff’d, 549 Pa. 620, 654 A.2d 547 (1995)). The Act was enacted “to facilitate self-policing in the health care industiy,” Yocabet v. UPMC, No. 569 WDA 2014, at p. 12 (Pa. Super. June 5, 2015), and “represents a determination by the legislature that, because of the expertise and level of skill required in the practice of medicine, the medical profession itself is in the best position to police its own activities.” Dodson v. DeLeo, 872 A.2d 1237, 1242 (Pa. Super. 2005); Young v. Western Pennsylvania Hospital, 722 A.2d 153, 156 (Pa. Super. 1998) (quoting Cooper, supra). To that end, Section 4 of the PRPA provides that peer review records “shall be held in confidence and shall not be subject to discovery or introduction into evidence in any civil action against a professional health care provider arising out of the matters which are the subject of evaluation and review by such committee....” 63 P.S. § 425.4.
The PRPA defines a peer review organization as “any committee engaging in peer review...to gather and review information relating to the care and treatment of patients for the purposes of (i) evaluating and improving the quality of health care rendered; (ii) reducing morbidity or mortality; or (iii) establishing and enforcing guidelines designed to keep within reasonable bounds the cost of health care.” 63 *500 P.S. § 425.2. “Peer review” is defined in Section 2 of the Act as “the procedure for evaluation by professional health care providers of the quality and efficiency of services ordered or performed by other professional health care providers, including practice analysis, ...and the compliance of a hospitaL.with the standards set by an association of health care providers and with applicable laws, rules and regulations.” Id. “The need for confidentiality in the peer review process stems from the need for comprehensive, honest, and sometimes critical evaluations of medical providers by their peers in the profession.” Piroli v. Lodico, 909 A.2d 846, 850 (Pa. Super. 2006) (quoting Young, supra). “Without the protection afforded through the confidentiality of the proceedings, the ability of the profession to police itself effectively would be severely compromised.” Joe v. Prison Health Services. Inc., 782 A.2d 24, 32 (Pa. Cmwlth. 2001); Young, supra.
“The PRPA does not, however, protect non-peer review business records even if those records eventually are used by a peer review committee.” Dodson, 872 A.2d at 1242. For example, incident reports that are prepared on behalf of a hospital’s risk management department are not shielded from discovery by the Act since they are primarily designed to facilitate the investigation of potential claims, rather than to improve the quality of medical care. See Atkins v. Pottstown Memorial Medical Center, 430 Pa. Super. 279, 283, 634 A.2d 258, 260 (1993); Venosh v. Henzes, 31 Pa. D. & C. 5th 411, 430 (Lacka. Co. 2013) (holding that “the two event reports are not protected from discovery by the PRPA since they constitute incident reports that were prepared on behalf of [the hospital’s] risk management department to document or investigate an event or potential claim,” and “were not generated by or for a peer review committee in assessing the quality *501 of the medical care that the treating health care providers furnished to Venosh.”), aff’d, 105 A.3d 788 (Pa. Super. 2014). Nonetheless, “documents generated by a peer review committee specifically for use in the peer review process are not discoverable simply because some of the information contained therein is available elsewhere.” Dodson, 872 A.2d at 1244.
By way of relevant background, the Estate of James L. Brink (“Brink”) sought to compel discovery of a Sentinel Event Report that Marian forwarded to the joint commission following Brink’s death by suicide at Marian on June 2, 2011. (Docket entry no. 140). By order dated January 30, 2015, Marian was directed to provide the undersigned with a copy of the Sentinel Event Report for an in camera review, together with copies of Marian’s Sentinel Event reporting policies and “proof of all recipients of the Sentinel Event Report,” including “whether the Sentinel Event Report was reviewed by the patient safety committee or the board of trustees of Marian Community Hospital.” (Docket entry no. 174). Although Marian timely submitted the Sentinel Event Report and an affidavit executed by its former chief executive officer (CEO), “Marian did not submit a copy of its ‘Sentinel Event reporting policies that were in effect at the time that the Sentinel Event Report was prepared in 2011,’ nor did it produce any proof whatsoever ‘of all recipients of the Sentinel Event Report,...of whether the Sentinel Event Report was reviewed by the Patient Safety Committee or the Board of Trustees of Marian....’” Brink, supra, at *2 (quoting docket entry no. 174). In the absence of any such information, we concluded that “Marian has not met its burden of establishing that the Sentinel Event Report is protected by the peer review privilege set forth in the PRPA,” Id. at *7, and reasoned:
*502 Section 4 of the PRPA grants discovery protection for the “proceedings and records of a review committee” that is engaged in peer review, and the discovery record is devoid of any indication that the Sentinel Event Report was prepared by or submitted to Marian’s peer review committee. In response to the order of January 30, 2015, Marian did not produce its Sentinel Event Reporting policies that were in effect in 2011, and which would arguably indicate whether the Sentinel Event Report was developed or reviewed by Marian’s peer review committee prior to its submission to The Joint Commission. Nor has Marian furnished the requested “documented proof of all recipients of the Sentinel Event Report,” which could clarify whether Marian’s peer review committee even received the Sentinel Event Report.
* * *
While it is true that Marian forwarded the Sentinel Event Report to The Joint Commission which arguably acted as a peer review committee for purposes of the PRPA, “a hospital cannot create protection for a document simply by sending it to the peer review committee.” [citation omitted]. The in camera review of the Sentinel Event Report reveals that the report does not contain or disclose the investigation or records of a peer review committee at Marian. It is laudable that Marian opted to transmit the Sentinel Event Report to The Joint Commission so that The Joint Commission could conduct a root cause analysis and communicate its findings and recommendations to Marian, but the fact remains that the Sentinel Event Report was not prepared by The Joint Commission, nor was it authored by or presented to Marian’s own peer review committee.
*503 Id. at *6-7.
After Marian secured new counsel, it filed the instant motion for reconsideration, and in addition to producing its Sentinel Event Policy, Marian provided a supplemental affidavit dated April 4,2015, from Mary Theresa Vautrinot who served as Marian’s Chief Executive Officer from 2005 to 2012. (Docket entry no. 201, Exhibits A, B). The stated purpose of Marian’s Sentinel Event Policy is “to identify all sentinel events as they occur, conduct a complete root cause analysis of any such event, and take the necessary steps to eliminate or substantially reduce the likelihood of a similar event occurring in the future.” (Docket entry no. 201, Exhibit A at p. 7). The policy defines a sentinel event “as an unexpected occurrence involving death or serious physical or psychological injury or risk thereof,” which “is not related to the natural course of the patient’s illness or underlying condition” and instead “is associated with the treatment, or lack of treatment, for this condition.” {Id. at p. 8). As per the itemized criteria set forth in the Sentinel Event Policy, a reviewable sentinel event includes any “[sjuicide of any individual receiving care, treatment or services in staffed around-the-clock setting or within 72 hours of discharge.” {Id).
Under the heading “How The Joint Commission becomes aware of a sentinel event,” Marian’s policy states that Marian “is encouraged, but not required, to report to The Joint Commission on any sentinel event meeting the above criteria for reviewable sentinel events.” {Id. at p. 9). “If The Joint Commission becomes aware (either through voluntary self-reporting or otherwise) of a sentinel event meeting the above criteria that has occurred” at Marian, Marian is required to:
prepare a thorough and credible root cause analysis and *504 action plan within 45 calendar days of the event or of becoming aware of the event, and
submit to The Joint Commission its root cause analysis and action plan, or otherwise provide for Joint Commission, evaluation of its response to the sentinel event under an approved protocol, within 45 calendar days of the known occurrence of the event.
(Id.). Marian’s Sentinel Event Policy requires the root cause analysis to contain the following characteristics:
focuses on systems and processes, not individual performance;
includes questioning “why” and identifying system process faults;
identifies changes to be made in systems and processes that would reduce the risk of such events occurring in the future (or determines, after analysis, that no such improvement opportunities exist);
implementation of improved processes or systems, if analysis determines.
(Id.). After the analysis and plan have been submitted, “[t]he Joint Commission will then determine whether the root cause analysis and action plan are acceptable.” (Id.).
With respect to the individuals and departments participating in the root cause analysis, Section IV of Marian’s policy states that “[hjospital leadership (CEO, medical staff members, appropriate VP, department director, VP for quality & safety) will be notified of a sentinel event,” and that “[ajppropriate medical staff members or the president of the medical staff will become involved and will be given support from leadership in the *505 investigation.” (Id. at p. 10). “Hospital legal counsel and insurance company will be consulted, as needed, prior to any Joint Commission notification and submission of a root cause analysis form.” (Id.). Additionally, “[t]he patient safety committee, the medical executive committee, as appropriate, and the board of directors will be informed of sentinel events and the results of the root cause analysis.” (Id.). Attached to Marian’s policy is a “sentinel event process” flow chart which reflects that once Marian “conduct[s] root cause analysis (within 45 days),” the next step is to “Refer to peer review, QI director of safety, as necessary,” and thereafter “report to patient safety committee, CEO, medical executive committee and board of directors (as necessary).” (Id. at p. 11). Finally, Marian’s policy provides that “[t]he root cause analysis will be maintained in the quality and safety department,” and that “[t]his information is considered confidential and protected under the Peer Review Protection Act (QI involvement).” (Id. atp. 10).
The supplemental affidavit by Marian’s former CEO attests that she “initiated a comprehensive review process regarding the circumstances surrounding [Brink’s] demise,” and “that the individuals participating in the root cause analysis included the vice president for quality safety/chief quality officer, the chief nursing officer, an RN shift manager, the behavioral health unit manager, a social worker, two therapeutic coordinators, a psychiatrist, the spiritual care vice-president, an emergency department physician, and the behavioral unit activities coordinator.”[1] (Docket No. 201, Exhibit B at ¶¶ 6, 8). The root cause *506 analysis was conducted “for the purpose of evaluating the quality of care rendered to the patient and developing new policies and procedures aimed at improving the quality of care provided to other patients in the behavioral health unit and reducing the risk of morbidity and mortality.” (Id. at ¶ 7). “The root cause analysis involved participants reviewing hospital records and policies, interviewing persons with knowledge of the event, and holding several meetings to discuss the event and how to improve patient safety.” (Id. at ¶10). The Sentinel Event Report prepared by Marian “contains the findings and plan of action developed as a result of the root cause analysis,” and “was sent by Marian Community Hospital only to The Joint Commission.” (Id. at^ 12-13).
Marian submits that its sentinel event policy and supplemental affidavit “demonstrate that the Sentinel Event Report was created by a peer review committee conducting a root cause analysis of the circumstances surrounding Mr. Brink’s death.” (Docket entry no. 205 at p. 8). Marian argues that because the Sentinel Event Report which it forwarded to The Joint Commission “contains the root cause analysis of the circumstances surrounding Mr. Brink’s demise and a plan of action for reducing the risk of similar events occurring in the future, the report certainly constitutes the findings and recommendations of a peer review committee,” and, as such, “is clearly privileged under the Act.” (Id. at p. 10). In reply, Brink claims that the Sentinel Event Report is not protected peer review since it was allegedly “prepared by the hospital’s risk management department,” as opposed to “the quality and patient safety department,” in anticipation of future litigation, not for the purpose of peer review.[2] (Docket *507 entry no. 210 atpp. 11, 15).
To constitute privileged peer review under the PRPA, Marian’s Sentinel Event Report must have been developed by a peer review body to evaluate the quality of the treatment and practices at Marian in an effort to reduce avoidable harm or death or to ensure compliance with the standards established by an association of health care providers. See 63 PS. §§ 425.2, 425.4. When the parties’ discovery dispute was first submitted for a decision, Marian failed to provide any proof of its applicable policies describing a Sentinel Event Report’s purpose or protocol, nor did it identify the individuals who participated in the preparation of the Sentinel Event Report. In fact, Marian’s original submissions mistakenly suggested that The Joint Commission, not Marian, had conducted the root cause analysis following Brink’s death, and specifically stated that “as a result of Mr. Brink’s death, The Joint Commission... reviewed the treatment rendered to Mr. Brink at Marian and issued a sentinel event report to the hospital.” (See docket entry no. 148 at pp. 2, 6-7). Therefore, the initial record submitted for our review did not demonstrate that Marian had prepared the Sentinel Event Report for peer review-related purposes. See Brink, supra, at *6 (“There *508 simply is no indication in the available discovery record that Marian’s Sentinel Event Report was ever prepared or reviewed by any peer review committee or patient safety committee at Marian.”). As a result, Marian did not satisfy its burden of establishing that the Sentinel Event Report is shielded from discovery by the PRPA. See Joe, 782 A.2d at 33 (since “defendants have not established that any of the requested documents concerning Dr. Caucci were produced by a ‘review committee’ during the course of a ‘peer review’ as defined in the Act..., they have not sustained their burden to establish that any requested documents are shielded from discovery by the Act.”).
Marian’s supplemental exhibits reflect that the Sentinel Event Report consisted of a “thorough and credible” root cause analysis designed to “eliminate or substantially reduce” the likelihood of a comparable suicide occurring at Marian. The root cause analysis identified system and process deficiencies at Marian, and was developed by Marian’s quality and safety officers, physician and nursing leaders, health care professionals, and members of Brink’s treatment team. The results of that group’s root cause analysis were communicated to Marian’s patient safety, medical executive and peer review committees. While Marian’s legal counsel and insurance company were subject to being “consulted” prior to the submission of the Sentinel Event Report to The Joint Commission, there is no indication in the record that Marian’s counsel or insurer ever participated in the preparation of the Sentinel Event Report.
In addition to the root cause analysis, Marian’s Sentinel Event Report also included an “action plan” recommending remedial measures by Marian to reduce the risk of a recurrence of another suicide. Consequently, the supplemental materials establish that Marian’s Sentinel *509 Event Report, comprised of a root cause analysis and an action plan, was generated by Marian to assess the quality of the care provided and systems in place at Marian, to improve the same and thereby reduce the risk of morbidity and mortality, and to assure that Marian complied with The Joint Commission’s standards. As such, the Sentinel Event Report was designed to improve the quality of behavioral health care at Marian, rather than to facilitate the investigation or defense of a prospective tort claim.
A motion for reconsideration is addressed to the sound discretion of the trial court, Ellenbogan v. PNC Bank, N.A., 731 A.2d 175, 180 n.7 (Pa. Super. 1999), which may reconsider an earlier order pursuant to 42 Pa.C.S.A. § 5505 “only if the motion for reconsideration is filed within thirty days of the entry of the disputed order.” PNC Bank, N.A. v. Unknown Heirs, 929 A.2d 219, 226 (Pa. Super. 2007). Marian filed its motion for reconsideration on April 6,2015, within ten days of our original order dated March 27, 2015. By virtue of the additional exhibits which have been produced by Marian, Marian has established that the Sentinel Event Report at issue constitutes protected peer review material under Section 4 of the PRPA. Accordingly, Marian’s motion for reconsideration will be granted, as will Marian’s de novo appeal of the special trial master’s order of November 17, 2014, and plaintiffs motion to compel responses to plaintiff’s request for production of document No. 24 will be denied.
And now, this 5 th day of June, 2015, upon consideration of the “motion for reconsideration of defendants, Marian Community Hospital, Maxis Health System and Catholic Health East, of the court’s order dated March 27, 2015, which denied the defendants’ petition for de novo review of the special trial master’s decision of November 17, 2014,” the supplemental exhibits and memoranda of law *510 submitted by the parties, and the oral argument of counsel on May 28, 2015, and based upon the reasoning set forth above, it is hereby ordered and decreed that:
1. The “motion for reconsideration of defendants, Marian Community Hospital, Maxis Health System and Catholic Health East, of the court’s order Dated March 27, 2015, which denied the defendants’ petition for de novo review of the special trial master’s decision of November 17, 2014” is granted;
2. “Defendant Marian Community Hospital’s petition for de novo review of special trial master’s decision of November 17,2014” is granted based solely upon Section 4 of the Peer Review Protection Act, 63 P.S. § 425.4; and
3. Plaintiff’s motion to compel responses to plaintiffs request for production of document no. 24, seeking the production of “ALT-0 summary report for Sentinel Event Report 148024” dated July 15, 2011, is denied.

. “The therapeutic coordinators, behavioral unit activities coordinator and social worker participated in the root cause analysis because they were part of Mr. Brink’s care team on the behavioral health unit.” (Id. at ¶9).

. Brink also contends that the Sentinel Event Report does not qualify as peer review since Brink’s behavioral health care providers *507 participated in its development, and because Marian’s policy states that its root cause analysis focuses on systemic issues, not individual performance. (Docket entry no. 210 at pp. 8-9). The second affidavit of Marian’s former CEO confirms that the quality and peer review personnel who prepared the report “interview[ed] persons with knowledge of the event,” but none of the materials submitted by the parties suggest that the treating providers were involved in any manner with the drafting of the Sentinel Event Report. See King v. Stefenelli, 862 A.2d 666, 672-673 (Pa. Super. 2004) (decedent’s treating physician interviewed during “morbidity conference” as part of peer review process). Furthermore, the definitions of’ peer review” and “review organization” in the PRPA reflect that the evaluation of “the operations of hospitals” and “practice analysis” at a hospital facility are proper subjects of protected peer review. See 63 P.S. § 425.2. Thus, both of those alternate arguments by Brink may be summarily rejected.